# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 24, 2006 Session

## STATE OF TENNESSEE v. STEVE ALLEN CLICK

**Direct Appeal from the Circuit Court for Blount County**
**No. C-14572     D. Kelly Thomas, Jr., Judge**

---

**No. E2004-02655-CCA-R3-CD - Filed March 21, 2006**

---

The defendant, Steve Allen Click, was convicted of three counts of aggravated rape and one count of evading arrest. The trial court imposed consecutive sentences of forty years for each aggravated rape and a concurrent sentence of eleven months and twenty-nine days for evading arrest. The effective sentence is, therefore, 120 years. In this appeal, the defendant asserts (1) that the trial court erred by failing to merge two of the aggravated rape convictions; (2) that the evidence is insufficient to support the convictions for aggravated rape; (3) that the prosecutor's closing argument was improper; and (4) that the trial court erred by imposing consecutive sentences. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Kristi M. Davis, Knoxville, Tennessee (on appeal) and Mack Garner, District Public Defender (at trial), for the appellant, Steve Allen Click.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Robert Headrick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At approximately 8:30 p.m. on March 25, 2003, the victim, Barbara Plaut, was attacked and raped while walking her dog on the greenway near her residence in Maryville. At trial, the victim testified that as she walked along a trail, she noticed a man, whom she later identified as the defendant, walking toward her. She remembered that she had seen the man on the greenway on an earlier occasion and that his appearance had frightened her. She recalled that the defendant, who was dressed in dark clothing, suddenly "lunged" at her and sprayed her face with mace. According to the victim, the defendant "grabbed at [her]," causing her to fall, and then "yanked" her to her feet,

sprayed her with mace again, and directed her into a nearby wooded area. She remembered that when they got into the wooded area, the defendant said, "I just hate bitches like you," as he struck her with what she believed to be a pipe. The victim described the blow as so hard that she saw "blue sparkles," fell to the ground, and then saw the silhouette of the defendant holding what appeared to be a pipe in his raised hand. According to the victim, the defendant stated his intention to rape her and ordered her to remove her clothes. She remembered that she took off her shirt and pants and the defendant cut her bra with a knife.

The victim testified that as she lay on her back, the defendant placed a cloth over her face, partially blocking her view, before penetrating her vagina with his penis. She described the initial penetration as "some thrusting . . . three, four, five, six times. And then he pulled out." The defendant then ordered the victim onto her hands and knees and used graphic terminology in expressing his intent to penetrate her anally. She recalled that when the defendant was not successful in this effort, he chose to penetrate her vagina a second time. She stated that the defendant again "thrusted" several times without ejaculating. According to the victim, the defendant then directed her to rise to her knees and forced his penis into her mouth. She testified that the defendant placed his hand on the back of her head, "thrusted" several times, and then withdrew without ejaculating. As he pulled up his pants, he ordered the victim not to move.

The victim testified that after the defendant had walked "a good distance" away, she put on her clothes, waited several more minutes, and then ran to a house and asked the female occupant to call the police. The victim stated that she then ran to another house, where a couple waited with her on their front porch until the police arrived. The victim described her assailant as a white male in his late twenties or early thirties, wearing dark clothing and a cap with a pattern on it. She recalled that when an ambulance arrived, she was treated briefly before the police drove her to the location of the rape. There, she saw the defendant standing in a nearby parking lot. The victim testified that she identified the defendant as her assailant and was then taken to Blount Memorial Hospital, where a forensic examination was performed. She stated that photographs were taken of her and that a "rape kit" was collected. The victim suffered a scalp laceration, a concussion, and numerous cuts and bruises, including some to her vagina.

During cross-examination, the victim explained that she did not fight the defendant because she feared for her life. She described the defendant as "extremely enraged" during the offenses. The victim conceded that she did not get a good look at the weapon, having seen it only in silhouette, but described it as "a cylinder," approximately shoulder width in length and not as wide as her wrist.

Gina Korczynski testified that at approximately 9:00 p.m. on the evening of the offenses, a blood-covered woman came to her house, "banging on the door, begging to come in. . . . Her clothes hanging from her, belt hanging. Stating she had been raped and beaten on the greenbelt." Ms. Korczynski, who explained that she and her husband did not invite the victim inside because they did not want to wake their children, stated that they waited on the front porch with her until police arrived.

John Foley of the Maryville Police Department, who was on patrol when he received a call to be on the look out in the greenbelt area for a white male wearing black clothing and a ball cap, testified that he observed a man who matched the description of the suspect walking toward a four-door, green Saturn parked near the woods. The officer stated that when he blocked the suspect's path to the Saturn and directed him to stop, the suspect, who was later identified as the defendant, ran several hundred yards before he was apprehended. The officer discovered the victim's glasses in the defendant's pocket.

At trial, Stephanie Montgomery, an optician at University Eye Surgeons, identified the glasses found in the defendant's pocket. She confirmed that they had been dispensed to the victim in December 2004.

Maryville Police Department Detective Carlos Hess, Jr., who was in charge of the investigation, testified that officers arrived on the scene within five minutes of the 911 call and had the defendant in custody within twelve minutes. He recalled that the victim's shirt and her bra, which had been cut and had blood on it, were found in the area where the rape occurred. He stated that officers found a can of mace nearby but the pipe described by the victim was never located. Detective Hess testified that he swabbed some small, reddish-brown stains on the defendant's hands and sent the swabs to the Tennessee Bureau of Investigation (TBI).

Marissa Younger, a registered nurse at Blount Memorial Hospital, testified that she conducted a forensic examination of the victim after the rape. She stated that she took photographs, collected clothing, performed a pelvic examination, and treated the victim for possible exposure to sexually transmitted diseases. Ms. Younger testified that the bruises and lacerations to the victim's head, back, and legs were consistent with blunt force trauma. She stated that the injury to the victim's back was six inches long and one inch wide and was consistent with the victim's having been struck by a metal pole.

Margaret Bash, a forensic scientist with the DNA unit of the TBI crime lab, testified that she performed a DNA analysis of the swabs taken from the blood stains on the defendant's hands. She confirmed that both of the swabs contained DNA of the defendant and the victim. Ms. Bash stated that the swab from the left hand indicated that the victim was the major contributor and the one from the right hand indicated the defendant was the major contributor. Swabs taken from the victim's mouth and vagina were negative for the presence of the defendant's sperm.

I

The defendant first asserts that the trial court erred by failing to merge the two convictions for aggravated vaginal rape into a single conviction. Citing State v. Phillips, 924 S.W.2d 662 (Tenn. 1996), he contends that because the two instances of vaginal penetration were separated by only a few seconds, they were part of the same offense and, as such, should have been merged. The state submits that because the two instances of vaginal penetration were separated by the defendant's failed attempt at anal penetration, separate convictions do not offend double jeopardy principles.

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, article 1, section 10 of the Tennessee Constitution provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. Our supreme court has noted that "three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996) (citations omitted). Our high court observed that "whether two offenses are the 'same' for double jeopardy purposes depends upon a 'close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances.'" Id. (quoting State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975)). Finally, our supreme court noted that while appellate review must be guided by the test announced in Blockburger v. United States, 284 U.S. 299, 304 (1932), that test is not conclusive of legislative intent and the reviewing court must also examine (1) whether there were multiple victims involved; (2) whether several discrete acts were involved; and (3) whether the evil at which each offense is directed is the same or different. Denton, 938 S.W.2d at 378-79.

Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense. Several general principles determine whether offenses are "stacked" so as to be multiplicitous:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Phillips, 924 S.W.2d at 665 (footnotes omitted).

In State v. Barney, 986 S.W.2d 545 (Tenn. 1999), our supreme court clarified the ruling in Phillips while considering the issue of when separate acts of illegal sexual conduct can support separate convictions. Citing People v. Madera, 282 Cal. Rptr. 674 (Ct. App. 1991), our high court ruled that the "critical consideration" was the intent of the defendant. Barney, 986 S.W.2d at 548-49. The relevant factors to be considered were identified as follows:

> 1. temporal proximity -- the greater the interval between the acts, the more likely the acts are separate;
> 2. spatial proximity -- movement or re-positioning tends to suggest separate acts;
> 3. occurrence of an intervening event -- an interruption tends to suggest separate acts;
> 4. sequence of the acts -- serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and

-4-

5.  the defendant's intent as evidenced by conduct and statements.

Id.

In this case, the first factor, temporal proximity, weighs against separate convictions because only moments separated the two vaginal penetrations. It was established at trial that the entire attack took less than half an hour. The second factor, spatial proximity, weighs in favor of separate convictions. The defendant first penetrated the victim's vagina as she lay on the ground and then ordered her onto her hands and knees in a futile effort to rape her anally. He then penetrated her vagina a second time. The third factor, the occurrence of an intervening event, also weighs in favor of separate convictions. As indicated, the vaginal rape of the victim was interrupted by the defendant's failed attempt at anal penetration. The fourth factor, the sequence of the acts, weighs slightly against separate convictions because the challenged rapes involve the penetration of the same orifice. Finally, the fifth factor, the defendant's intent, weighs in favor of separate convictions. The defendant not only attempted anal penetration but also stated his intent to do so before ordering the victim onto her hands and knees. The second vaginal penetration occurred only after the defendant had unsuccessfully attempted to penetrate the victim anally. Under these circumstances, it is our view that the separate convictions for aggravated vaginal rape are not multiplicitous. The defendant is not entitled to relief on this issue.

II

The defendant also asserts that the evidence is insufficient to support the aggravated rape convictions. He contends that because no weapon was found, the state failed to prove that he used a deadly weapon to commit the offenses. The state submits that the victim's testimony and the injuries she suffered were sufficient to establish that the defendant used a deadly weapon.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Aggravated rape is defined as "unlawful sexual penetration of a victim by the defendant . . . [where] [f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon

or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." Tenn. Code Ann. § 39-13-502(a)(1) (2003).

In this case, the victim testified that the defendant struck her with what she believed to be a pipe. While conceding that she did not get a good look at the object, she described it as "a cylinder" that was less than two feet long with a circumference the size of the courtroom microphone. She insisted that the object was not a stick. A nurse confirmed that the injuries to the victim were consistent with blunt force trauma from a "metal pole." Photographs indicating that the victim suffered a severe scalp laceration and a long bruise to her back are facts from which the jury could reasonably have inferred the use of a weapon. Under these circumstances, it is our view that the circumstantial evidence was sufficient to establish that the defendant used a deadly weapon to commit the rapes.

## III

The defendant next contends that the prosecutor made an improper remark during his closing argument. The state submits that the defendant waived any challenge to the closing argument by failing to lodge a contemporaneous objection.

Initially, the state correctly points out that the defendant did not object during the prosecutor's closing argument. Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); see also State v. Jenkins, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); State v. Rhoden, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Whether properly assigned or not, however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).

Before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;

(d) the accused [must not have waived] the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

Id. at 641-42 (footnotes omitted). Our supreme court characterized the Adkisson test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. Sparks v. State, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court articulated the factors to be considered in making that determination:

(1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]

(2) [t]he curative measures undertaken by the court and the prosecution[;]

(3) [t]he intent of the prosecutor in making the improper statements[;]

(4) [t]he cumulative effect of the improper conduct and any other errors in the record[; and]

(5) [t]he relative strength or weakness of the case.

539 S.W.2d at 344.

Most restrictions during final argument are placed upon the state. That is based in great measure upon the role of the prosecutor in the criminal justice system:

[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and,

-7-

especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Judge, 539 S.W.2d at 344-45. Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. The prosecutor must not express a personal belief or opinion, but whether that qualifies as misconduct often depends upon the specific terminology used. For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion. United States v. Stulga, 584 F.2d 142, 147 (6th Cir. 1978). The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. See Dupree v. State, 410 S.W.2d 890, 892 (Tenn. 1967); Moore v. State, 17 S.W. 30, 35 (Tenn. 1929); Watkins v. State, 203 S.W. 344, 346 (Tenn. 1918); McCracken v. State, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972). Although there may be no commentary on the consequences of an acquittal, the prosecution may point out the gravity of a particular crime and emphasize the importance of law enforcement. See State v. Dakin, 614 S.W.2d 812, 815 (Tenn. Crim. App. 1980); Bowling v. State, 458 S.W.2d 639, 641 (Tenn. Crim. App. 1970).

This court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

During his rebuttal argument, the prosecutor made the following comment:

[Defendant's attorney] has asked you to put your anger and/or revulsion aside. I say don't you dare. That is part and parcel of your common sense; that is part and parcel of what the Judge will instruct you that you are to utilize, that being your common sense, in sitting and evaluating this case.

In this case, the defendant conceded at trial that he was the assailant and simply argued that he should be convicted of a lesser offense than aggravated rape. The proof of his guilt as to the charged offenses was practically uncontroverted. Under these circumstances, it is our view that the prosecutor's isolated remark did not affect the verdict of the jury. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). In consequence, the error would not rise to the level of plain error.

IV

Finally, the defendant asserts that the trial court erred by ordering consecutive sentencing. The state submits that consecutive sentencing was appropriate because the defendant has an extensive record of criminal activity.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), our high court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Comments. The 1989 Act is, in essence, the

codification of the holdings in <u>Gray</u> and <u>Taylor</u>; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[1] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2003).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); <u>State v. Lane</u>, 3 S.W.3d 456 (Tenn. 1999).

The trial court ordered consecutive sentences on the following grounds:

> The issue of whether these sentences should be served at the same time or consecutively to each other, the law provides that the [c]ourt may order sentences to run consecutively if the [c]ourt finds by a preponderance of the evidence that the [d]efendant is an offender whose record of criminal activity is extensive. And for a person who was born in 1979, and is 25 years old, to have the felony and misdemeanor convictions that I have recited earlier, that is an extensive criminal record.
>      . . . .

---

[1] The first four criteria are found in <u>Gray</u>. A fifth category in <u>Gray</u>, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. <u>See</u> Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Comments.

. . . [T]here very well may be situations that one would consider more severe than this, serial rapists who attack many victims on different days and times, that very well is, I would say. But the law merely sets a standard that has to be met to justify a maximum sentence and a standard that has to be met to justify consecutive sentencing. And that does not mean that only one type of offense can meet both those standards and everything else has to be something less. And it's clear to me from these facts that this case meets both of those standards, sadly enough.

The record establishes that the defendant had fifteen prior convictions as an adult and five prior juvenile adjudications. Ten of the adult convictions, including four convictions for aggravated burglary and four convictions for theft over $1000, were for felony offenses. Under these circumstances, the record supports the trial court's determination that the defendant is an offender whose record of criminal activity is extensive. In our view, the trial court did not err by imposing consecutive sentences.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE