**Robert Charles SPARKS, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee.

Feb. 6, 1978.

Certiorari Denied by Supreme Court April 3, 1978.

Michael D. Noel, Nashville, for appellant.

Brooks McLemore, Jr., Atty. Gen., Henry E. Hildebrand, III, Asst. Atty. Gen., Nashville, Elmer Davies, Jr., Dist. Atty. Gen., Franklin, Douglas T. Bates, III, Asst. Dist. Atty. Gen., Centerville, for appellee.

DAUGHTREY, Judge.

## OPINION

The defendant-appellant, Robert Charles Sparks, was indicted for first degree murder in the shooting death of his niece, Jeannie Lee Sanders. The jury found him guilty of second degree murder, and he was sentenced to twenty years in the state penitentiary. On appeal the defendant raises multiple assignments of error, the most serious of which concerns the prosecution's closing argument to the jury. Because we find reversible error on this ground, the case must be remanded for a new trial on the second degree murder charge.

The tragic death involved in this case occurred at the end of a day-long family reunion held in Perry County following the local church's "home coming." The defendant's niece, Ms. Sanders, borrowed her uncle's car and took several other family members (including the defendant's wife) for a ride. The defendant apparently became angered because the group was late returning his automobile. When they finally arrived, he slapped his wife, knocking her back into the car; he then hit the victim and again slapped his wife. With that, the defendant retrieved a shotgun from the trunk of his automobile, and, ignoring the pleas of a bystander, followed Ms. Sanders into the house. According to the defendant's sister (and mother of the victim), who was allegedly in the house at the time, the defendant said to his niece, "I'm going to kill you, nigger." The defendant fired once, the victim fell to the floor mortally wounded, and the defendant immediately cried out, "Lord have mercy, it was an accident, it was an accident."

Ms. Sanders was rushed to a hospital where she was subsequently pronounced dead. When questioned by the local sheriff at the hospital later that same night, the defendant admitted that he had shot the victim and turned over the shotgun.

At trial the defense theory was that the shooting was an accident, or, at most, amounted to voluntary manslaughter. On appeal the defendant attacks the suffi-

ciency of the evidence on the latter basis, arguing that the legal presumption of malice which normally arises from the use of a deadly weapon was rebutted by the evidence in this case, and that absent proof of malice the conviction for second degree murder cannot stand. This issue presents a question of fact, however, which has already been determined by the jury. Under normal circumstances, the jury's determination will not be disturbed on appeal unless the evidence at trial clearly preponderates against their verdict. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173 (1963). A review of the record in this case convinces us that the *McBee* standard has not been met. On the other hand, while the defendant conceded at trial that he shot the victim, the crucial evidence concerning malice and intent (and especially concerning the credibility of the eye-witness, the victim's mother) was vigorously disputed, and given the inflammatory nature of the prosecutor's closing argument, we are unable to say that the outcome was not affected by the improper argument.

That closing argument can best be characterized as being, in large part, unsworn testimony by the district attorney. Such argument is, of course, improper. *See Russell v. State,* 532 S.W.2d 268 (Tenn.1976); *Judge v. State,* 539 S.W.2d 340 (Tenn.Crim. App.1976); *Bowling v. State,* 3 Tenn.Cr. App. 176, 458 S.W.2d 639 (1970). The problem was compounded by the substance of the testimonial argument: the prosecutor injected, wholly gratuitously we think, several racial issues which had no place in the trial of this case.

Although a transcription of the jury's selection is not included in the bill of exceptions, all twelve members of the jury were apparently white; all twelve were also apparently voir-dired on the basis of their ability to decide the case without reference to the race of the defendant or the deceased victim, both of whom were black. No objection to this procedure has been raised, and we find no legal impediment to it. *See Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

However, other racial considerations included in the closing argument clearly should have played no part in the trial of this lawsuit, unless they were directly related to issues fairly raised by the evidence in the record. We think this was not the case, and despite the defendant's failure to enter a contemporaneous objection to the argument of the district attorney specifically addressed to these extraneous racial questions, we conclude that the resulting prejudice to the defendant was so serious that the trial judge should have intervened sua sponte. *Watkins v. State,* 140 Tenn. 1, 8–9, 203 S.W.2d 344, 346 (1918); *Nashville Railway & Light Co. v. Owen,* 11 Tenn.App. 19, 30–33 (1929). As it was put so well by the United States Supreme Court in *New York Central Ry. Co. v. Johnson,* 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706 (1929):

> The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made up by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict uninfluenced by the appeals of counsel to passion or prejudice.

In his final argument, the prosecutor first raised the issue of race in connection with the defendant's purported threat to the victim, delivered just prior to the shooting. The district attorney predicated his comments on his statement to the effect that the jurors should use common sense and their common experience in reaching their verdict. But we think his remarks are not clearly a matter of universal knowledge or experience. He told the jury:

> You have had the experience in your life of being in association with black people; when black people are talking to each other but where there's a white person present and one of them calls the other one a nigger that can mean several things but many times it has an element of jest in it, or joking. Most often I think it's probably said to curry favor

with the white person that's listening to the conversation thinking that he or she would think it was sorta funny for one black person to call another black person a nigger. Not so when two black people are talking to each other and there are not any white people present, then when one of them calls the other one a nigger that's different, that means the fur is about to fly.

There was no objection to this argument. It was followed by an even more serious breach of the rule requiring temperate argument based only on the evidence adduced at trial when the district attorney concluded his remarks with:

In the Military of all crimes when an execution is carried out by a firing squad the weapons are loaded such that some of the firearms have blanks and others of them have the live bullets and the purpose of that of course is that when the execution is carried out no one knows who it is that actually fired the shot that killed the man. The responsibility is tremendous and the idea is to spread the responsibility around. In much the same way the responsibility is shared in this situation where you all, as the Jury, are called on to perform a most important function. To begin with the responsibility started with the ninety-nine members of the House of Representatives of this State and the thirty-three Senators and they studied the matter and they passed a law that where a killing was done under such conditions that made it first degree murder that there was no further discretion, that the only applicable sentence was the death, they made that decision, they took on that responsibility, that is the law and the Judge will charge you that law. Then the Governor of the State had to approve that law so he took on his responsibility. Then down to the individual case, this case of Charles Robert Sparks, the first responsibility had to be the responsibility of Sheriff Charles Qualls, he had to make the first decision, the first decision to charge this man, so he shared the responsibility. And then after him the thirteen members of the Perry County Grand Jury, they had to take on their responsibility, they didn't try the case, they didn't hear the case as though they would try it, they only heard one side of it, I believe they heard practically all you heard, they didn't hear that May Frances had written a bad check or that she had been publicly drunk but they heard about everything else and they decided that he should be charged with murder in the first degree.

*Mr. Noel:* May it please the Court, I'm going to object to this whole line of argument, as the Jury and the Court knows its the Jury that has to try these facts and not the responsibility of anybody else and I object to the whole line of argument and I think it's improper.

*The Court:* Overruled.

*Dist. Atty. Gen. Davies:* So they shouldered their responsibility and they charged this man with murder in the first degree. Then the next person in line was the District Attorney, he had to meet his responsibility and in doing that and in determining whether or not this is a case that I should ask for the death penalty I had many thoughts and one of the things that disturbs me about the law is the misconception that people have about the law and you know that there is a common thing I don't know that it's really as widely believeed [sic] as someone would have you think but there is a common misconception that the only people that face the death penalty are poor people and blacks, you've heard that repeatedly. Well I don't believe that that's true but I know that the is widely talked about and it bothers me that this Court or any of the four Courts in this Circuit would have a reputation that that is the kind of thing that we did and because this defendant was a black my first thought was well, No because he's black don't ask for the death penalty and then I thought again well that's not right because that's really against what I'm trying to think about because the woman that he killed was also black and that changes the whole thing as far as I am concerned. When

you all were selected I asked everybody the long involved question, if you would treat this case just as though these people were of the same race as you and every one said you would. This may be a very difficult thing to do, even though you said you would it still may be a very difficult thing to do but my thinking is that all of the evidence in this case is present, all of the elements have been proved, the defense is actually nothing. I would say that if these people back on August 31st in Perry County were white people and one of them just senselessly went out and shot a shotgun into his niece for no more reason than the fact that she had returned the car late that this would be a case where you would return the death penalty. Now I'm saying because they were black is no reason to do different.

█ The thrust of this argument is that the legislature "shouldered its responsibility" in passing a mandatory death penalty, that the governor "shouldered his responsibility" by approving it, that the sheriff did likewise by arresting the defendant, that the grand jury heard the evidence and discharged its responsibility by charging the defendant with murder, and that the district attorney "shouldered his responsibility" by seeking the death penalty. The momentum of this argument is almost palpable, even on the written record: that the jury's resulting responsibility was to impose that penalty, and not merely to determine guilt or innocence based on the testimony in the case.

In delivering this argument, the prosecutor ranged widely outside the record, especially with regard to the evidence presented to the grand jury and the process he followed in deciding to seek a first degree conviction. It is true that the jury acquitted the defendant of first degree murder and thus avoided imposition of the then mandatory death penalty sought so passionately by the prosecution in its closing argument. It could be argued that this action by the jury mooted any question of prejudice arising from this obviously improper closing argument. But given the record, the fact that the sentence was twice the minimum penalty for the offense of second degree murder, the extent and nature of the district attorney's argument, with its inflammatory racial overtones, the failure of the trial judge to intervene in response thereto, his subsequent error in refusing to sustain defense counsel's timely objection to the argument, and the resulting lack of any cautionary instructions to the jury, we are unable to say that the outcome of the trial was not affected to the prejudice of the defendant by the State's closing argument. *See generally Judge v. State, supra.*

█ We recognize that reasonable latitude must be given to counsel in expressing their views of the case to the jury. Because of this, trial judges have wide discretion in controlling the arguments of counsel, and their action will not be reversed absent an abuse of discretion. Nevertheless, we think it is clear in this case that the prosecutor did not meet the requirement under Tennessee law that his argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." *Russell v. State, supra* at 271. We conclude that the defendant is entitled to a trial which is not punctuated by a closing argument which so clearly violates this standard.

Because the case must be remanded, we find it advisable to deal with several other issues which may resurface upon retrial. The first concerns the trial judge's refusal to sequester the local sheriff, over the objection of defense counsel, on the ground that the sheriff is "the constitutional officer of this county and anything that's happened in the county I'm of the opinion that he's privileged to it." Thus the sheriff was not subjected to sequestration even though the State conceded its intent to call him as a witness after the production of other prosecution witnesses. (The State also conceded that the sheriff was not the official prosecuting witness in this case, because the grand jury returned a presentment, requiring no prosecutor. T.C.A. § 40–1705.)

We know of no authority to support the trial court's broad ruling on this issue. However, we are aware that there have been some specific exceptions created to the general rule of total sequestration. T.C.A. § 24–106; *Dougherty v. Shown,* 48 Tenn. 302 (1870); *Rainwater v. Elmore,* 48 Tenn. 363 (1870); *Smith v. State,* 72 Tenn. 428 (1880); *Lenoir Car Co. v. Smith,* 100 Tenn. 127, 42 S.W. 879 (1897); *Adolff v. Irby,* 110 Tenn. 222, 75 S.W. 710 (1903); *Hughes v. State,* 126 Tenn. 40, 148 S.W. 543 (1912). In addition, it has always been prudently recognized (usually in the form of *dicta*) that the needs of justice and the public interest require that a certain amount of judicial discretion be maintained in the area. This does not mean, however, that the trial court is at liberty to make what are otherwise arbitrary exceptions (to the general rule) that are not based on some articulated demonstration of necessity. *Pennington v. State,* 136 Tenn. 533, 538, 190 S.W. 546, 547 (1916).

Therefore, upon timely motion to sequester, we think the better practice is to exclude all witnesses until they are called to testify or are otherwise, by necessity, excused from the rule. (The single recognized exception is, of course, the defendant, who is afforded a constitutional right to be present at all stages of his trial. *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).) However, the defendant in this case concedes that there was no actual prejudice as a result of the trial court's ruling, because the sheriff's testimony was not directly related to the testimony of other prosecution witnesses who testified in his presence. While we conclude that the error here was thus harmless, we caution against its repetition on retrial.

Finally, the defendant assigns as error the introduction of certain medical x-rays as an exhibit to the testimony of the doctor who unsuccessfully treated the victim after she was rushed to the hospital emergency room. The defendant insists that these x-rays were cumulative to the doctor's testimony and were, therefore, unnecessarily inflammatory. We disagree.

The x-rays themselves, while probably cumulative, were apparently relevant to show the nature and extent of the victim's wounds. Furthermore, we find nothing inherently inflammatory about x-rays. In point of fact, and when compared to photographs of a corpse, the reverse is probably true. As long as the trial judge is convinced of their relevancy (i. e. that the x-rays in question depict what they are purported to depict in such a fashion that they are helpful to the jury in the determination of a material issue at trial), there is no error in their introduction into evidence.

In closing, we note that retrial in this case will be made more difficult than usual because of the passage of more than two years since the date of the victim's death on August 31, 1975. The defendant was arrested on the same date, he was indicted at the October 1975 term of court, and he was tried in March, 1976. The amended motion for a new trial was overruled in July, 1976; the defendant was given 90 days in which to prepare and file his bill of exceptions. The court reporter, however, did not submit a transcription until August, 1977, more than a year after the motion for a new trial was overruled. This delay occurred despite an order on November 1, 1976, following the filing of the technical record in this court, directing the immediate filing of the transcript. This court has since been informally notified by certain of its officers that the delinquent court reporter has retired. For this reason, and no other, we decline to invoke Supplemental Rule 7 of this Court, allowing citation for contempt under circumstances such as those presented in this case. That rule, and the other rules promulgated by this Court, are designed to effect the efficient administration of justice, a goal which is undermined by delays such as have occurred here. In conclusion, we call attention to T.C.A. § 40–2032, authorizing a criminal court judge, with the approval of the Executive Secretary, to designate auxiliary court reporters when needed.

The judgment of conviction is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

DWYER, P. J., and RUSSELL, J., concur.

DWYER, Presiding Judge, dissenting.

When the prosecutor in his closing remarks argued that all officials associated with this case, legislature, governor, sheriff, grand jury and judge, had done their duty, I must concede that those remarks exceeded the bounds of legitimate argument. While it is true that this argument did not indicate all of these officials found the appellant guilty, I think an indirect implication of guilt was a direct inference that the jury could infer from the remarks. I would, however, and do differ from the majority in reversing and remanding this case for retrial.

With the jury finding the appellant guilty of a lesser offense than murder in the first degree, and with ample evidence to support premeditation found in this record, I would, in view of the overwhelming evidence of guilt, reduce the punishment from twenty years to ten years, if the State accedes. In short, I would invoke the thinking of our Supreme Court found in *Smith v. State,* 527 S.W.2d 737, 739 (Tenn. 1975), and subject to the consent of the State, reduce the punishment to the statutory minimum of ten years. In all other assignments I concur in the views as expressed by the majority.