IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 19, 2012

**STATE OF TENNESSEE v. JAMES DREW FREEMAN, JR.**

**Appeal from the Circuit Court for White County**
**No. CR003544      Leon C. Burns, Jr., Judge**

---

**No. M2011-00184-CCA-R3-CD - Filed May 9, 2012**

---

The defendant, James Drew Freeman, Jr., appeals from his White County Circuit Court jury conviction of second degree murder, claiming that the admission of the autopsy report via a witness who did not perform the autopsy violated his constitutional right to confront the witnesses against him, that the State engaged in improper and inflammatory closing argument, and that the evidence was insufficient to support his conviction. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. JERRY L. SMITH, J., not participating.

William F. Roberson, Cookeville, Tennessee, for the appellant, James Drew Freeman, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall A. York, District Attorney General; and Gary McKenzie, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A White County Circuit Court jury convicted the defendant of second degree murder for his role in the death of his mother, Zella Freeman, on August 2, 2008. At trial, Peggy Swindell testified that on August 2, 2008, she stopped by Old Bon Air Cemetery with her husband and her mother to visit her father's grave. As they pulled into the cemetery, Ms. Swindell saw "a puff of dust" that looked as though "somebody took off." Her husband remarked, "We've caught somebody throwing their garbage out." At that point, Ms. Swindell realized that what her husband thought was garbage was actually a body. She

parked her car and called "738711," explaining that a call to 9-1-1 would have reached Overton County emergency services rather than White County authorities. The dispatcher told Ms. Swindell not to approach the body. Ms. Swindell said that it was shortly before 8:00 p.m. when she made the call. Dewey Swindell testified that as they awaited emergency personnel, he saw a "medium"-sized maroon car driving on the main road just off the road leading to the cemetery. He saw no other vehicles in the area.

White County Sheriff's Department Deputy Jacob Groce testified that he was dispatched to the Old Bon Air Cemetery at approximately 7:45 p.m. to investigate "a possible body being dumped." When he arrived, he observed the victim's body "l[]ying there in the gravel, a large blood stain on her back area and on the ground." He secured the crime scene and waited for the sheriff to arrive.

Tennessee Bureau of Investigation ("TBI") Agent Dan Friel, who assisted White County authorities in the investigation of the victim's murder, testified that he prepared a diagram of the scene. Agent Friel also identified aerial photographs of the cemetery, which showed a horseshoe drive traversing the cemetery and going over a slight hill. Agent Friel testified that tire tracks led to the victim's body, over her legs, and beyond her body around the horseshoe drive. The tires left what Agent Friel described as "a hole in her leg, from possibly gravel flying as somebody was exiting the cemetery in haste." Investigators found blood on the gravel in the driveway "approximately every six f[ee]t or so."

Agent Friel testified that after they had collected evidence and documented the scene, officers rolled the victim's body over and observed "a shotgun hole" in the victim's back surrounded by shotgun pellets. Agent Friel said that the condition of the body and the lack of blood trails indicated that the victim's body had been dumped where it lay rather than dragged to that location. Agent Friel recalled that none of the forensic evidence suggested that more than one vehicle had been involved in dumping the victim's body and causing her injuries.

Larry Johnson, the victim's next door neighbor, testified that he saw the victim's daughters, Nell Russell and Josie Freeman, as well as the defendant at the victim's residence early on the day of her death. He recalled that Ms. Russell and Ms. Freeman left the victim's residence in Ms. Russell's car just after lunchtime and that he did not see either of them again until after the defendant's arrest. Mr. Johnson said that he left his residence after lunch, and when he returned between 5:30 and 6:00 p.m., he saw no cars in the victim's driveway. Later that evening, between 8:30 and 9:00 p.m., Mr. Johnson heard "a car door slam," and then the defendant knocked on his front door. Mr. Johnson testified that when he answered the door, the defendant immediately said, "Mama's dead. Mama's dead.

Mama's dead." Mr. Johnson responded, "No, Mama's not dead." Mr. Johnson said that the defendant then told him that the victim had been "with a real estate man, and the real estate man had killed her" by shooting her in the back. The defendant also told him that the victim, who was clothed in a pink nightgown, was at the Old Bon Air Cemetery. At that point, Mr. Johnson got his pistol and his flashlight and walked outside to feel the hoods of the cars in the victim's driveway. He also walked around the victim's residence.

Mr. Johnson said that after this brief investigation, he "picked up the phone to call to check, and then decided to get ahold of 911." He testified that he asked the dispatcher "if they had anything going on on the mountain" and specifically "if there was a lady shot and run over at the cemetery." Detectives told Mr. Johnson to keep the defendant at his residence.

During cross-examination, Mr. Johnson said that he had never had any trouble with the defendant but had experienced trouble with the defendant's sister Josie, who had accused Mr. Johnson of strange behavior. Mr. Johnson testified that the victim gave the defendant everything he asked for but refused to allow the defendant in her home when he was drinking. He recalled that Ms. Russell arrived a few days before the victim's death and that he had not ever seen Ms. Russell before, despite having lived next door to the victim for three years.

Mr. Johnson testified that in his role as a professional bondsman, he posted the defendant's bond several months after the defendant was arrested for the victim's murder. As partial payment for his professional fee, Mr. Johnson took possession of a 1995 Buick LeSabre and a Ford truck. The LeSabre, he said, had belonged to Ms. Russell, and she had been driving the LeSabre when she visited the victim the week before the murder. Mr. Johnson testified that in the process of cleaning the LeSabre, he noticed that the trunk had been "washed down" and that "there was water standing in the carpet." He said that he tested the trunk's seal to determine whether he needed to replace the seal before selling the car and determined that "[t]he seal was fine." Mr. Johnson said that he reported the condition of the trunk to police.

Troy Hatfield, custodian of 9-1-1 records, presented the recording of the emergency calls made in this case. The first was Ms. Swindell's call at 7:47 p.m., and she told the dispatcher that "she believed she had seen a body that may have been thrown out of a small maroon car." At 9:17 p.m., Mr. Johnson called and reported that the defendant "was on his front porch" and had told Mr. Johnson that "his mother had been shot with a shotgun at the Old Bon Air Cemetery."

During cross-examination, Mr. Hatfield admitted that the increased volume of

-3-

radio traffic led a number of people to call and inquire about the situation on Bon Air Mountain. During redirect examination, however, Mr. Hatfield testified that the radio traffic did not include any mention of the victim's name, that the victim was a female, or that she had suffered a shotgun wound. He said that officers did not have any information that a shotgun may have been involved until Mr. Johnson's call at 9:17, and that that information was not relayed over the radio but was given to the sheriff directly by telephone.

White County Sheriff's Department Detective Chris Isham testified that the sheriff asked him to assist in the investigation of the victim's murder. He arrived at the scene shortly after 8:00 p.m., and approximately one hour later, "Sheriff Shoupe received a phone call from 911, and he was told that a Mr. Johnson had [the defendant] at his house, and [the defendant] was giving Mr. Johnson information about his mother being murdered." Detective Isham said that authorities considered the information "significant because [they] could not identify the victim." Detective Isham recalled that the victim was lying on her back in a pool of blood and that the only injury visible at that point was "a large wound on one of her legs where her legs appeared to have been r[u]n over."

After receiving the information from 9-1-1, Detective Isham and Detective John Ford went to 225 Randall Street, which was the victim's residence, and observed the defendant standing in the yard "more towards Mr. Johnson's" residence with his hands in his pockets. Detective Isham said that he was concerned about the defendant's posture because the defendant "had information that we did not have." Because of his concern, Detective Isham asked the defendant to remove his hands from his pockets and then patted the defendant down. As he patted the defendant down, Detective Isham found "two sets of car keys, some pill bottles, and . . . a shotgun shell." At that point, Detective Isham provided the defendant with *Miranda* warnings and began to question him. The defendant told the detective "that a man had told him something had happened to his mother and she was on the mountain." Upon further questioning, the defendant said that the victim "had been shot in the back of the head, and that she was at Old Bon Air Cemetery." Because the information related by the defendant was known at that time only to law enforcement personnel and the perpetrator, Detective Isham questioned the defendant further regarding the "man" that had allegedly harmed the victim. The defendant never provided him with an identity. Detective Isham said that the defendant told him that the victim was "with Jesus." The defendant also told Detective Isham that the victim "was wearing a bathrobe that was striped, a pink nightgown, and shoes and socks." Detective Isham said that the victim was clothed just as the defendant described.

Detective Isham said that as he spoke with the defendant, he became concerned for Ms. Freeman because she lived with the victim and her whereabouts were unknown. Detective Isham testified that the defendant told him that Ms. Freeman was in South Carolina

but that the defendant then knocked on the door of the residence and said, "Josie, come to the door." He contacted Detective Ford with his concerns, and Detective Ford told him to kick in the door and search the house. Detective Isham said that he searched the house but found no one inside.

After searching the residence, Detective Isham turned his attention to the cars in the driveway. He recalled that a blue tarp was hanging from the trunk of the defendant's small, maroon Buick. The defendant gave Detective Isham permission to search the vehicle, including the trunk, but Detective Isham found nothing of significance during his "cursory search." The vehicle was later towed to "the county garage where it could be locked up and nobody could get to it."

Detective Isham also received the defendant's permission to search the defendant's residence at "1348 East." He described the defendant's living conditions as "squal[o]r," explaining, "It was filthy. There . . . were dead dogs laying around. The house was extremely cluttered. Just extremely dirty." The defendant admitted that he owned a shotgun and added that "he had a friend who had a .20 gauge."

Detective Isham testified that other officers transported the defendant to the sheriff's department while Detective Isham returned to the crime scene. After he completed his duties at the crime scene, Detective Isham went to the sheriff's department to question the defendant. He said that he reminded the defendant of the earlier *Miranda* warnings and that he asked the defendant when he had last seen the victim. The defendant claimed that the victim "was supposed to meet with a money man or a real estate man that day, that was the last time he saw her. And he indicated that he felt that's who had committed the crime." The defendant was never able to provide a name for the alleged perpetrator.

Six days after the murder, Detective Isham received a report that the victim's purse had been found in a weeded area adjacent to the victim's property. Detective Isham asked Special Agent Craig Whitaker to bring his "firearms dog" to the location to see whether the murder weapon might have been discarded along with the victim's purse. The owner of the property gave the officers consent to search, and they conducted a canine-assisted search of the weeded area. The dog indicated the presence of a firearm by sitting down, and Detective Isham found a .20 gauge shotgun that had been "broke[n] down" and a box of shotgun shells. The box of shells matched the shell found in the defendant's pocket, and three shells were missing from the box. Detective Isham explained that the gun and shells were well hidden, saying, "You could walk past it a million times and you'd never see it."

During cross-examination, Detective Isham said that he would have been

interested in any weapon found at the victim's residence when he first arrived because at that point he "did not know what kind of wound she had received." The defendant did not tell Detective Isham that he had found the shotgun shell only that "he had a friend who had a . . . .20 gauge shotgun." Because of the defendant's statement regarding the "money man or real estate man," Detective Isham spoke with George Elrod, "an accountant and financial advisor" in Sparta who had handled the victim's financial affairs. He said that other than a single annuity from another state, the victim's financial affairs were handled exclusively by Mr. Elrod. Attempts were made, he thought, to contact the annuity company, but he could not recall the result of those attempts. Detective Isham testified that officers did not attempt to do a forensic comparison of the tire tracks at the cemetery to the tires on the defendant's car because only the Federal Bureau of Investigation could perform such a comparison, and "[t]o get a full sampling, you have to have a complete rotation of the tread," which they did not have because the cemetery drive was composed of loose gravel. Detective Isham said that the defendant did not appear concerned that the victim was not home and that "it was clear from his behavior that she was at Old Bon Air Cemetery."

During redirect examination, Detective Isham testified that Mr. Johnson told Detective Isham that the defendant's car was not at the victim's residence at 6:00 p.m. but was there when the defendant knocked on his door. Although no one saw the defendant driving his vehicle, Detective Isham testified that "common sense" would indicate that the defendant had driven the vehicle to the victim's residence "[b]ecause he's there with the vehicle and the keys."

TBI Special Agent Tommy Calahan testified that he arrived at the Old Bon Air Cemetery at 9:01 p.m. on August 2, 2008, and observed "a single body lying on the edge of the roadway, . . . . it appeared it was an elderly lady." He said that "there was blood in and around the body" and that "it was apparent that the vehicle that had r[u]n over the lower portion of her body had blood transfer on the tires and had left a blood trail as the tire rolled over on its exit around the loop there in the cemetery." They did not attempt to take casts of the tire tracks because the roadway in the cemetery was comprised of loose gravel, which was "not conducive to leaving some type of tread pattern that could be preserved and compared with a suspect vehicle." Agent Calahan testified that the location of the body and the tire tracks leading away from it were consistent with the account provided by the Swindells of a cloud of dust moving away from the body around the cemetery loop. Based upon his training and experience, Agent Calahan concluded that the victim's body was moved approximately three feet by the force of the vehicle striking her. He also opined that the victim "was shot at this location. She was not shot somewhere else, loaded up, and dumped, so to speak, at this location." Officers did not discover her wound until they turned the body over at approximately 11:30 p.m. Agent Calahan said that when the victim's body was turned over and her clothing pulled back to expose the wound, he knew immediately that

she had suffered a shotgun wound.

While executing a search warrant at the defendant's residence, officers discovered a spent shotgun shell that matched the one discovered in the defendant's pocket. "Rust and degradation" on the shell indicated that the shell had been out in the elements "a while." The shotgun, box of shells, the intact shell found in the defendant's pocket, the spent shell found at the defendant's residence, the defendant's clothing, and the defendant's maroon Buick were all sent to the TBI crime lab for forensic examination and testing.

Doctor Thomas Deering, a forensic pathologist employed by Forensic Medical Management, a company that provides autopsy services by contract, testified that his partner, Doctor Andy McMaster, performed the autopsy of the victim. Doctor Deering said that he read Doctor McMaster's report, examined the photographs and x-rays taken during the autopsy, reviewed the toxicology report, and studied the "circumstances and history" provided by law enforcement to reach his "own opinion as to the cause and the manner of death in this case." Doctor Deering explained that the cause of the victim's death was "a shotgun wound to the back, and multiple blunt force injuries" and that the manner of death was homicide. Doctor Deering testified that the victim suffered a single shotgun wound to her back, which produced "a ragged central hole, and then a lot of little holes in the skin around it." From the appearance of the wound, Doctor Deering concluded that "there was bird shot" in the shell fired at the victim. Based upon the presence of "a plastic shot cup" inside the wound, Doctor Deering determined that the gun was "six to seven feet away" when the victim was shot. The victim also suffered injuries to her lower legs, particularly fractures of her left femur and left tibia just below and just above her knee. He said that the x-rays also showed "some small fractures of the pelvis on the right side." The victim suffered superficial abrasions to her legs, buttocks, and scalp.

During cross-examination, Doctor Deering acknowledged that the autopsy report listed the victim's time of death as 11:30 p.m. but explained that that time was "more an administrative time of death" than a scientific estimate of "exactly what time we thought the person died." He added that his office did not generally perform any tests to estimate the actual time of death when performing autopsies. Doctor Deering said that his office sent the victim's clothing to the TBI for testing, but he did not think that his office had removed paint from her clothing to send separately. Doctor Deering explained that the slight bleeding associated with the victim's leg injuries indicated that she "may have been dead or near dead when those happened."

Former TBI Special Agent Laura Lee Staples testified that she performed deoxyribonucleic acid ("DNA") testing on several items in conjunction with the investigation into the victim's death. Testing on stains on the tires of the defendant's vehicle "'indicated

the presence of blood[] but failed to indicate a stain of human origin.'" Additionally, stains on the undercarriage of the vehicle proved to be blood of non-human origin. A stain on the muffler, however, was human blood, but Ms. Staples was unable "to obtain a DNA profile due to insufficient or degraded DNA." Gravel taken from the cemetery driveway tested positive for the presence of the victim's blood. The defendant's clothing tested positive for the blood of "an unknown male contributor."

TBI Special Agent Dan Royce, who was certified as a firearms expert, testified that he examined "a .20 gauge shot shell and shot shell case" as well as "112 shot pellets from the victim, a plastic shot wad from the victim, a pink nightgown from the victim, a blue and white striped housecoat from the victim, a Harrington & Richardson .20 gauge shotgun, a fired .20 gauge shot shell case, and a box containing 22 unfired Remington .20 gauge shot shells." Agent Royce testified that the fired shot shell recovered from the defendant's residence was "basically indistinguishable" from the intact shell recovered from the defendant's pocket on the night of the victim's murder. He said that the pellets recovered from the victim's body were consistent in "size and weight specifications" with the shot in the live shot shell recovered from the defendant's pocket, as was the .20 gauge plastic shot wad. Agent Royce testified that he performed tests to determine whether the fired shell recovered from the defendant's residence had been fired from the gun recovered near the victim's residence. He said that "the fired shot shell had the same shape and contour and size of firing pin impression on it" but that the primer on the fired shot shell case "was so corroded" that he could not match it specifically to the shotgun found by Detective Isham. Based upon tests he performed on the victim's clothing, Agent Royce concluded that the victim was shot from a distance "greater than four feet, but less than eight feet." Agent Royce testified that, because of its design, the shotgun in this case would only eject gunshot residue from the muzzle, making it "much less likely" that the shooter's hands or clothes would test positive for gunshot residue.

TBI Forensic Scientist and Special Agent Laura Hodge, who specialized in gunshot residue analysis and fire debris analysis, testified that gunshot residue testing performed on the defendant's hands was inconclusive. She explained that "[g]unshot residue is very fragile evidence" and that, in this case, the defendant had some level of the elements contained in gunshot residue but that those levels were insufficient to yield a positive test result. She said that in a weapon of the type found by Detective Isham, "the majority of the gunshot residue will come out the end of the barrel . . . down range" rather than near the shooter's hands. Agent Hodge testified that gunshot residue testing of the defendant's shoes and clothing "did not reveal the presence of particles of gunshot primer residue."

White County Sheriff's Department Detective Ruben Hormilla testified that he interviewed the defendant "three or four days" following his arrest. An audio recording

of the defendant's interview was played for the jury. During the interview, the defendant told Detective Hormilla that the victim told him that she planned to meet with "a man" about "some annuities" on the day that she was murdered. He said that he spent part of the day with the victim and his sisters and that at approximately 10:30 or 11:00 a.m., his sisters drove him to his residence to pick up some dogs. The defendant said that his car "never even moved" at any point on the day of the victim's murder and that Ms. Russell and Ms. Freeman left from his house to go directly to Charlotte, North Carolina.

The defendant denied telling Mr. Johnson that the victim was dead and maintained that Mr. Johnson had "told a lie on" him. The defendant claimed, however, that "someone at Mapco" had told him before he went to Mr. Johnson's that "somebody that was kin" to the defendant was "up on the mountain and they didn't know" if the person was dead or alive. The defendant said that he "didn't know how" the man at Mapco knew that the victim had been killed. He said that he walked from the Mapco to the victim's residence and sat on the porch after realizing that the victim was not home.

The defendant said that he last spoke with the victim via telephone at approximately 1:00 p.m. He insisted that the victim "went off with a man because of that house down there plus he was with the annuities." The defendant said that he did not ask the victim the identity of the annuity man because he "did not get into" the victim's "business." He also said "a robbery could be involved in this" because an "IB" card had been stolen from the victim on the day before she was killed and because the victim "had a lot of money." The defendant said he was "so mixed up" on the day of the victim's death because of the poor condition of his feet, the fact that dogs were being killed, and the fact that he had not seen his sister Nell "in five or six years."

Regarding the .20 gauge shotgun and shells discovered in conjunction with the investigation, the defendant said that a "guy from Charlotte" whose name he could not recall and who was "dead by now," had left them at his residence. He claimed that he found the shotgun shell that officers found in his pocket next to a bench he likes to sit on near his residence.

Detective Hormilla said that nothing in his investigation indicated that robbery was a motive for the victim's death.

Christy Gribble testified that she was working at the Mapco on August 2, 2008. She did not recall any person entering the store and saying anything about a body at Old Bon Air Cemetery.

The defense called TBI Forensic Scientist and Special Agent Linda Littlejohn,

who testified that she compared hair and fibers collected from the exterior of the defendant's maroon Buick with samples taken from the victim and the clothing she was wearing at the time of the murder. She did not find any matches.

TBI Forensic Scientist and Special Agent Miranda Terry testified that she "was asked to work" the defendant's maroon Buick and the victim's clothing "for trace evidence." Agent Terry said that she found a paint chip on the victim's housecoat that did not match the paint of the defendant's vehicle.

TBI Forensic Scientist and Special Agent Elizabeth Reid testified that she examined "a shotgun, a shot shell case, and a box of shells" for the presence of latent fingerprints but found none. Agent Reid explained, however, that "[i]t's fairly difficult" to recover latent prints from a weapon such as a shotgun. She added that environmental factors could erode the presence of fingerprints. Agent Reid said that the TBI recovers latent fingerprints from weapons in only ten to 15 percent of homicide cases.

White County Sheriff's Department Detective John Ford testified that he was the lead investigator for White County authorities and that Agent Calahan was the lead investigator for the TBI. Detective Ford said that the groundskeeper for the property adjacent to the victim's residence discovered the victim's purse and that he was surprised that the purse was discovered so close to the victim's residence after a search warrant had been executed at the property by police on the day following the murder. Detective Ford testified that when he went to the victim's residence to examine the purse, the defendant's sisters showed him the purse "but then immediately left" without saying where they were going, which struck him as odd. He said that the purse was not turned over to police for inventory or forensic examination.

Detective Ford said during cross-examination that he examined the trunk of Ms. Russell's car and found it to be dry. The defendant stood to inherit, among other things, the victim's Randall Street residence upon her death.

Josie Freeman, the defendant's sister, testified that the defendant spent the majority of his time at his Ravenscroft residence. The defendant came to the Randall Street residence that Ms. Freeman shared with the victim so that the women could help him with his various medical problems. Ms. Freeman said that the victim "loved [the defendant] very much" and that she "catered to him quite a bit." She stated that the defendant was a "very capable" musician who had previously had "a contract with Columbia Records" and that the victim helped the defendant pursue his music career by supporting him financially. Ms. Freeman claimed that, prior to the victim's murder, she saw a strange man running quickly near the residence and that she and the victim often heard strange noises. She added that

"some insurance men . . . kept appearing at our house, and going through our house and looking at our Studebaker and our two motorcycles." She said that "Johnny Jackson and Ruben Foster" from Sumner County were "moving [the victim's] money around."

Ms. Freeman testified that on the day of the victim's murder, she and Ms. Russell drove the defendant in Ms. Russell's car to his Ravenscroft residence so that they could pick up a dog. She said that she and Ms. Russell left the defendant at his residence and drove directly to Charlotte, where Ms. Russell lived.

Based upon this evidence, the jury convicted the defendant as charged of second degree murder. Following a sentencing hearing, the trial court imposed a sentence of 17 years' incarceration. The trial court denied the defendant's timely motion for new trial, and the defendant filed a timely notice of appeal.

In this appeal, the defendant asserts that the trial court erred by permitting Doctor Deering to testify regarding the autopsy performed by Doctor McMaster, claiming that the introduction of the autopsy report via Doctor Deering violated his constitutional right to confront the witnesses against him. In addition, the defendant contends that the prosecutor engaged in improper and inflammatory closing argument and that the evidence was insufficient to support his conviction. We consider each claim in turn.

*I. Confrontation Clause*

The defendant asserts that the admission of the autopsy report by an expert other than the one who performed the autopsy violated his state and federal constitutional right of confrontation. The State contends that the trial court did not err by permitting Doctor Deering to testify regarding the contents of the autopsy report.

Initially, the defendant did not object to the admission of the autopsy report itself and instead limited his objection to Doctor Deering's testimony. On appeal, the defendant again asserts that Doctor Deering's expert testimony based upon the autopsy conducted by Doctor McMaster violated his right of confrontation. Contained in his appellate argument is an implicit challenge to the admission of the autopsy report itself. We consider these related issues separately due to the issue of waiver attendant to the admission of the autopsy report.

*A. Autopsy Report*

As indicated, the defendant did not challenge the admission of the autopsy

report itself and instead confined his objection to Doctor Deering's offering testimony based upon the report. His argument on appeal, however, suggests a challenge to the admission of the autopsy report. Because he failed to lodge a contemporaneous objection, however, he has waived our consideration of the propriety of the admission of the report. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context[.]"); Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Moreover, because the admission of the autopsy report was harmless beyond a reasonable doubt, the error attendant to its admission cannot be classified as "plain" such as to warrant our review of the issue.

Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice." Tenn. R. App. P. 36(b). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "'plain' is synonymous with 'clear' or equivalently 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993) (citing *United States v. Young*, 470 U.S. 1, 16 n.14, (1985)). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 732, 113 S. Ct. at 1776 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the definition of "substantial right" promulgated by this court in *Adkisson*. There, we held that "a 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'" *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson's* five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial
> court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is 'necessary to do substantial justice.'"

*Id.* (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. To be reviewable as "plain," the error "must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original). Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

With these standards in mind, we consider whether any error attendant to the admission of the autopsy report qualifies as plain. The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court departed from decades' long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial

-13-

when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

In *Melendez-Diaz v. Massachusetts*, the Court moved beyond the realm of interrogation to consider whether "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and thus subject to exclusion as violative of the confrontation clause. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2530 (2009). The Court answered that question in the affirmative, concluding that "not only were the affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' but under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." *Id.* at 2532 (citations omitted). The court held that "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the accused] had a prior opportunity to cross-examine them, [the accused] was entitled to 'be confronted with' the analysts at trial." *Id.* (quoting *Crawford*, 541 U.S. at 54). Concluding that live confrontation of the witness by the accused was the only constitutionally permissible way "to challenge or verify the results of a forensic test," the Court observed that confrontation would serve to "weed out" both fraudulent and incompetent forensic analysis. *Id.* at 2536-37. The Court rejected the argument that reports of forensic testing were admissible as business records and that business records were exempted from the ruling in *Crawford*, explaining, "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because – having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial – they are not testimonial." *Id.* at 2539-40.[1]

---

[1]The State cites several cases from other jurisdictions admitting autopsy reports absent confrontation based upon their status as business records or their character as "routine" or "non-analytical" evidence. Those cases, however, precede the Court's ruling in *Melendez-Diaz*, and their precedential value in light of the Court's ruling is dubious at best. *See United States v. Williams*, 740 F. Supp. 2d 4, 8 (D.D.C. 2010) (questioning admission of autopsy reports via the business records exception following the Court's ruling in *Melendez-Diaz* and stating that when an autopsy report can be classified as testimonial under the primary purpose test, "[w]hether the documents also qualify as business records under the hearsay rules . . . is irrelevant").

Most recently, the Court elaborated on the *Melendez-Diaz* ruling in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). In *Bullcoming*, the prosecution introduced the results of forensic testing via the testimony of a forensic analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2709 (2011). The Court declared that such a procedure violated Bullcoming's confrontation right, holding, "As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id.* at 2713. The Court rejected the argument that substitute testimony satisfied the constitutional requirement because of the reliable nature of the tests themselves, explaining that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id.* at 2715 (quoting *Melendez-Diaz*, 129 S. Ct. at 2537). Emphasizing as it did in *Crawford* that "'[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts,'" *id.* at 2716 (quoting *Crawford*, 541 U.S. at 54), the Court observed that it was not "'the role of courts to extrapolate from the words of the [Confrontation Clause] to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values,'" *id.* (quoting *Giles v. California*, 554 U.S. 353, 375 (2008)), and held that the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination," *id.*

It is against this constitutional backdrop that we examine the defendant's challenge to the admission of the autopsy report via Doctor Deering's testimony. In light of the Court's ruling in *Bullcoming*, it is clear that surrogate testimony will not satisfy the confrontation clause where testimonial evidence is involved. Thus, the relevant inquiry here is whether the autopsy report in this case was testimonial. Utilizing the primary purpose test, we conclude that the autopsy report prepared by Doctor McMaster was testimonial. Although an autopsy may be conducted and a report generated for purposes other than its use at a later criminal trial, the autopsy report in this case was clearly prepared for use as evidence in a criminal case. When authorities came upon the victim's body, it was patently obvious that she had been the victim of foul play. Indeed, she lay in a puddle of her own blood, her body having been discarded like refuse in the driveway of the Old Bon Air Cemetery. That her body also bore conspicuous tire tracks also suggested that the victim had died of other than natural causes. By the time the victim's autopsy was conducted, authorities had already concluded that she had been murdered and had begun to build their case against the defendant as the perpetrator. No ongoing emergency existed for police to attend, and no other purpose for the preparation of the autopsy report was shown in this case.

Under these circumstances, we cannot say that the autopsy in this case had as its primary purpose anything other than use in a criminal trial. *See United States v. Moore*, 651 F.3d 30, 73 (D.C. Cir. 2011) (classifying autopsy report as testimonial where autopsy was requested by law enforcement personnel and circumstances of the victim's death indicated a homicide).

Because the autopsy report was testimonial, the admission of its contents absent Doctor McMaster's being present for cross-examination at trial violated the defendant's right to confront the witnesses against him. That being said, we view the admission of the report, even absent waiver, to be harmless beyond a reasonable doubt. *See Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e. g.*, *Delaware v. Van Arsdall*, 475 U.S. [673, 679, 684 (1986)], and see no reason why denial of face-to-face confrontation should not be treated the same."). The defendant did not contend that the victim's death was anything other than a homicide, and he could not have done so credibly given the other proof at trial. The record establishes that the shotgun wound to the victim's back was obvious and that even the investigating officers recognized it as a shotgun wound. The same is true of the tire tracks on the victim's body. The defendant challenged only his identity as the perpetrator of the victim's murder, a determination upon which neither the autopsy report nor Doctor Deering's testimony shed much light. More importantly, however, as we discuss more fully below, the evidence more than sufficiently established the defendant's guilt for the charged offense. Because the erroneous admission of the autopsy report was harmless beyond a reasonable doubt, review of the issue for plain error is not "'necessary to do substantial justice.'" *Smith*, 24 S.W.3d at 283 (quoting *Adkisson*, 899 S.W.2d at 641-42).

## B. Doctor Deering's Testimony

Certainly, Doctor Deering's testimony placed some of the findings of his colleague, Doctor McMaster, before the jury as he related to the jury his opinion about the cause of the victim's death.[2] That testimony, however, was well within Doctor Deering's field of expertise, and the autopsy report prepared by Doctor McMaster was "of a type reasonably relied upon by experts" in his field. *See* Tenn. R. Evid. 703. Because the autopsy report was admitted into evidence without objection by the defendant, nothing prevented Doctor Deering from providing testimony from the report or from revealing some of the contents of the report to the jury. Furthermore, the defendant had the opportunity to thoroughly cross-examine Doctor Deering about his own conclusions regarding the victim's

---

[2]The Supreme Court has granted certiorari in *People v. Williams*, 939 N.E.2d 268 (Ill. 2010), to consider the issue whether the results of forensic analyses that form part of the basis of an expert's opinion may be disclosed by the expert while testifying at trial in the absence of the analysts who performed them. *People v. Williams*, 939 N.E.2d 268 (Ill. 2010), *cert. granted*, 131 S. Ct. 3090 (June 28, 2011).

cause of death and to point out the limitations placed on Doctor Deering's testimony because he did not participate in the autopsy. Other courts considering the admissibility of expert testimony based upon otherwise inadmissible testimonial evidence after the Court's rulings in *Melendez-Diaz* and *Bullcoming* have concluded that "the Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon." *See, e.g.*, *Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011); *United States v. Pablo*, 625 F.3d 1285, 1292 (10th Cir. 2010) (holding that when "the disclosure of this otherwise inadmissible [testimonial] information is to assist the jury in evaluating the expert's opinion [and], not to prove the substantive truth of the otherwise inadmissible information" no confrontation clause violation exists). Indeed, Justice Sotomayor, concurring in the majority opinion in *Bullcoming*, observed, "We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence," suggesting that "independent opinion about underlying testimonial reports" might be permissible. *Bullcoming*, 131 S. Ct. at 2722.[3] Finally, because the admission of the autopsy report was harmless beyond a reasonable doubt, any violation of the defendant's confrontation rights via Doctor Deering's testimony was likewise harmless beyond a reasonable doubt.

## II. Closing Argument

The defendant contends that the prosecutor engaged in prosecutorial misconduct by peppering his closing argument with facts not in evidence and inferences that were not reasonably based on the evidence. The State asserts that the defendant waived consideration of the propriety of one of the challenged remarks by failing to object at trial and that the remaining remark was not improper.

The defendant complains specifically about two statements made by the prosecutor. The first came near the beginning of the State's summation:

> Now, we know that sometime before 6:00, because Larry Johnson testified that when he got back at 6:00, that [the defendant's] car was not at home. So we know that sometime before 6:00 he got his mama and convinced her to ride with him, ride her in the car.

---

[3]Clearly, however the State may not use expert opinion as "a backdoor conduit for otherwise inadmissible testimonial hearsay." *Pablo*, 625 F.3d at 1292. Constitutional error occurs when an expert does not render an independent opinion but simply parrots inadmissible testimonial evidence.

The defendant objected to this statement, arguing that "[t]here is absolutely no indication that that's what happened in this case, and no witness has brought any testimony from which that could be inferred." The trial court observed that "[t]here was no direct proof in that regard, that's true," and the prosecutor agreed to "restate" his argument. The court then noted that "counsel may . . . argue reasonable inferences." The second remark came at the end of the State's argument:

> And she cries to you from the graveyard, and from the pellets
> that they took from her body, and from the shotgun-cup wad that
> we extracted from her lungs, and from the tests we did on the
> blood underneath the undercarriage, she says only to you, only,
> that you have an oath.

The defendant did not object to this statement at trial but includes it in his argument on appeal as an example of the "State's attempt[] to confuse the jury with conjecture rather than fact."

We agree with the State that the defendant has waived appellate review of the second challenged remark by failing to lodge a contemporaneous objection. Further, we find it unnecessary to review the propriety of the remark via plain error because the defendant has failed to satisfy the criteria for plain error review. *See Smith*, 24 S.W.3d at 282-83.

Turning to the remaining challenged remark, we note that despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Id.* We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *Id.* (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). When determining the propriety of closing argument, this court considers the following factors:

> (1) The conduct complained of viewed in the context and in
> light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the
> prosecution[;]

(3) [t]he intent of the prosecutor in making the improper statements[;]

(4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]

(5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Here, we cannot say that the prosecutor's remark was improper, let alone that it was so improper and inflammatory as to require a new trial. The evidence adduced at trial established that Mr. Johnson observed the defendant's car in the victim's driveway just after lunchtime on the day of the murder. When Mr. Johnson returned at 6:00 p.m., the car was not there. When the defendant knocked on Mr. Johnson's door at approximately 9:00 p.m., the car had returned. The defendant drove a maroon car, and the victim's body was dumped from a maroon car. Other witnesses testified that the amount of blood at the scene and the lack of any blood trails led to the conclusion that the victim was shot at the cemetery. The prosecutor reasonably inferred from these facts that the defendant had transported the living victim to the cemetery in his car. The prosecutor's use of the word "know" in this context was inapt, but the prosecutor corrected himself following the defendant's objection and told the jury that it could make the above referenced inference from the facts. Under these circumstances, no error occurred.

## III. Sufficiency

The defendant claims that the evidence was insufficient to establish his identity as the perpetrator of the victim's murder. The State contends that the evidence was sufficient.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are

resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1).

The evidence adduced at trial established that Mr. and Ms. Swindell observed the victim's body lying in the driveway of the Old Bon Air Cemetery just after they saw a cloud of dust indicative of a car taking off at a high rate of speed. Shortly thereafter, Mr. Swindell observed a maroon car on the main highway at the end of the cemetery drive. Mr. Johnson testified that the defendant's maroon Buick was not in the victim's driveway when Mr. Johnson returned home at approximately 6:00 p.m. The car was in the driveway when the defendant knocked on Mr. Johnson's door at approximately 9:00 p.m. During that encounter, the defendant told Mr. Johnson that the victim was dead, having been shot with a shotgun at the Old Bon Air Cemetery. Other proof established that although authorities had arrived on the scene at the cemetery by the time the defendant made his admission, the victim had not been identified, and the shotgun wound to her back had not yet been discovered. Moreover, the law enforcement witnesses were adamant that the details reported by the defendant were never reported in the radio traffic. When officers arrived at the behest of Mr. Johnson, the defendant had a .20 gauge shotgun shell in his pocket, and he told officers that the victim was "with Jesus." Testing established the presence of human blood on the muffler of the defendant's car. A fired .20 gauge shotgun shell was located at the defendant's residence, and a .20 gauge shotgun and shells consistent with those possessed by the defendant were found near the victim's residence. A plastic shot cup and pellets recovered from the victim's body during the autopsy were consistent with the shell possessed by the defendant, the fired shell found at the defendant's residence, and those shells found with the gun. Given the defendant's unexplained possession of the shotgun shell, the presence of human blood on his car, the fact that his car matched the description of the car seen leaving the scene, the forensic evidence linking all the shotgun shells to the one that killed the victim, and the defendant's damning admission to Mr. Johnson, the evidence more than sufficiently establishes the defendant's guilt.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE