# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 10, 2013

## STATE OF TENNESSEE  v. MASHAAL ARRADI

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3674     Cheryl A. Blackburn, Judge**

---

**No. M2013-00613-CCA-R3-CD - Filed March 7, 2014**

---

The Defendant, Mashaal Arradi, was convicted by a Davidson County jury of three counts of tax evasion and one count of theft of property valued at over $1,000 but under $10,000. He received an effective sentence of three years, to be released after serving 10 days incarceration, and was ordered to pay restitution.  On appeal, the Defendant asserts that the trial court erred in (1) permitting admission of unreliable scientific evidence through a non-expert witness; (2) allowing multiple references to 404(b) evidence without a jury-out hearing; (3) permitting the felony theft charge to be based on an aggregation of evidence; (4) permitting multiple references to the Defendant's Yemeni background and Arabic language; and (5) allowing instances of prosecutorial misconduct.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Tricia Herzfeld, for the Defendant-Appellant, Mashaal Arradi.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and James Milam, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Defendant co-owned and operated Sam & Son Market, a convenience store located in Nashville, Tennessee, with his uncle Nassr Arradi[1] and Nabil Bady. The store sold beer, cigarettes, drinks, snacks, chips, and other miscellaneous items. The three co-owners rotated the management operations of the store on a one-year basis, and did not hire any other employees.

Agent Barry Cayce, a Special Agent with the Tennessee Department of Revenue, investigated Sam & Son from December 1, 2009 to November 30, 2010, during which time the Defendant and Nassr alternated running the store. Agent Cayce testified that the Defendant ran the store from December 2009 until March or April 2010, after which Nassr ran the store until the end of the investigatory period in November 2010. Agent Cayce testified that during the formal conference with the Defendant, the Defendant admitted that "he knew that he was under reporting sales because business was slow, their expenses were high, and he needed it to operate the business and pay the bills." He further testified that the Defendant initially told him that Sam & Son's sales averaged between $600 and $900 per day, but later estimated that sales were between $1,000 and $1,100 per day.

Agent Cayce's testified extensively about the "Purchase Factor Method," an investigational tool used by the Revenue Department to calculate Sam & Son's unreported sales and sales tax. The method involves obtaining the inventory numbers of a store's purchases from its distributor and using that number to calculate the amount of sales tax a business owes. This number is then compared to the actual reported sales tax and any discrepancy in the two numbers can reveal unreported sales. Agent Cayce testified that his investigation of Sam & Son only used beer sales because beer purchases are taxed at the higher, nonfood rate of 9.25% in Davidson County and beer can never be exempt from sales tax. He obtained Sam & Son's monthly beer purchase history during the investigatory period from Det Distributing and Ajax Turner Distributing, the only two beer distributors used by Sam & Son. He then added the purchases from the two distributors together and considered this total to be Sam & Son's monthly taxable beer sales. He then created a chart to compare this total to Sam & Son's reported sales tax and expose any discrepancy. The chart, which was introduced into evidence and published to the jury, displayed the following information:

---

[1] Nassr Arradi will be referred to as "Nassr" throughout this opinion so as to avoid confusion with the Defendant because the two share the same last name.

| Corrected Taxable Sales | Corrected Sales Tax | Reported Sales Tax | Unreported Sales Tax |
|---|---|---|---|
| $189,225.00 | $17,503.30 | $10,009.00 | $7,494.30 |

Column one, labeled "Corrected Taxable Sales," displays the calculated total taxable sales during the investigatory period, which was determined by adding the inventory purchases from Det Distributing and Ajax Turner Distributing. Column two, labeled "Corrected Sales Tax," was calculated by multiplying Davidson County's 9.25% beer sales tax by the Column one monthly beer taxable sales. Column three, labeled "Reported Sales Tax," displays the actual sales tax reported by Sam & Son, taken from Sam & Son's sales tax returns obtained by the Department of Revenue Records Office. Column four, labeled "Unreported Sales Tax," displays the difference between the reported sales tax, under Column three, and the corrected sales tax, under Column two. Thus, the number in the fourth column, $7,494.30, is the estimated amount of sales tax that Sam & Son failed to report during the investigatory period. Agent Cayce prepared another chart to compare Sam & Son's beer purchases, or corrected taxable sales, to its reported taxable sales. That chart, which was also introduced into evidence and published to the jury, indicated that Sam & Son under reported its taxable sales of beer for the investigatory period in the amount of $107,851.00.

Agent Cayce explained that these calculations were estimations only because sales tax is only owed to the state after inventory is actually sold. When asked if the beer "disappeared by means other than sales or vendor restocking," Agent Cayce responded that the Defendant told Agent Cayce that he occasionally drank some of the store's beer but that he always paid for it. Further, there were no reports filed with the Nashville Police Department of thefts of beer from Sam & Son during the investigatory period. Additionally, Agent Cayce testified that Sam & Son marked up the price of their beer in order to make a profit, and his calculations did not take into account any markup price. If the markup price had been used in the calculation, Agent Cayce opined that "the unreported sales tax would have been higher" than what was calculated.

Agent Cayce explained that a "z tape" is a managerial type paper that is printed at a store's cash register either at the end of an employee's shift or at the end of the work day. Agent Cayce opined that a z tape is a "great benefit to have" on a cash register because it records register transactions, provides the total cash, credit card, and check transactions, and provides the total tax collection for the period of use. Agent Cayce testified that Sam & Son's cash register was capable of producing z tapes but he never saw any of their z tapes. When he asked the Defendant about the z tapes, the Defendant told him that he wrote down information from the z tapes on a piece of paper and did not keep the z tapes.

On cross examination, Agent Cayce agreed that the two interviews conducted with the Defendant were not recorded or transcribed as this is not the procedure used by the Department of Revenue. He explained that he took written notes during the interview and later memorialized those in a typed memorandum. He also agreed that the notes from the interview were not word for word statements made by the Defendant. He conceded that he did not ask the Defendant about thefts or spoilage to explain the disappearance of the beer. He explained that his team checked with the police department for reports of theft, and that distributors pick up unsold beer and give credit to the retailers, which would have been taken into account in their investigation.

Glen Taylor testified that he was hired by Sam & Son to prepare its tax papers, including its monthly tax returns, in early 2009. He affirmed that he prepared their monthly tax returns during the investigatory period from December 2009 through November 2010. He went to the store to meet with either the Defendant or Nassr, depending on the month, to get the store's sales information in order to prepare the tax returns. Mr. Taylor testified that the Defendant provided him Sam & Son's gross sales for the months of December 2009, January 2010, and February 2010, which was evidenced by the checks signed by the Defendant made payable to the Tennessee Department of Revenue for the tax due during those months. Nassr provided the gross sales and signed the checks for the taxes during the months of April, May, June, July, August, September, October, and November 2010. Mr. Taylor informed the Defendant and Nassr about proper business practice and told them that they should keep any business records, including invoices and cash register z tapes, for three years. He asked to see the z tapes in preparing his tax papers, but was never provided them. Mr. Taylor explained that if the store's monthly gross sales were inaccurate then the total monthly tax would also be inaccurate. He stated that he was never provided records to verify the gross sales, but assumed that the Defendant and Nassr told him the truth concerning the store's sales.

Sadeq "Sami" Arradi, Nassr's brother and the Defendant's uncle, testified that he helped with the Sam & Son's business on occasion and was familiar with the store's operation. He explained that the store starts each day with $100 in the register, and at the end of the day the owner would count the cash at the register less the $100 to determine the total sales for that day. He opined that the store's system was easier than using z tapes. He also stated that Sam & Son had issues with shoplifting, including theft of beer, and spoilage of items that could not be sold to customers. Additionally, he explained that it is necessary to keep beer coolers full, which sometimes resulted in the store purchasing more beer than was sold to customers in a given month.

Following deliberation, the jury convicted the Defendant of three counts of tax evasion, Class E felonies, and one count of theft of property valued at over $1,000 but under

$10,000, a Class D felony. He received an effective sentence of three years, to be released on probation after serving 10 days incarceration, and was ordered to pay restitution. He filed a timely motion for new trial on October 1, 2012, and filed an amended motion for new trial on January 24, 2013. In his amended motion, he raised eleven grounds for relief. A hearing was held on January 25, 2013, during which no evidence was presented. Following the hearing, the trial court entered a written order denying relief. It is from this order that the Defendant now appeals.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in five respects, each of which warrant the granting of a new trial. Specifically, he asserts that the trial court erred in (1) permitting admission of unreliable evidence purportedly based on scientific method through a non-expert witness; (2) allowing multiple references to 404(b) evidence without a jury-out hearing; (3) permitting the felony theft charge to be based on an aggregation of evidence; (4) permitting multiple references to the Defendant's Yemeni background and Arabic language; and (5) allowing instances of prosecutorial misconduct.

**I. Expert Testimony.** The Defendant's first claim takes issue with the admission of testimony about the Purchase Factor Method by Agent Cayce. The Defendant asserts that the Purchase Factor Method is scientific evidence because "it concerns a matter the average juror would not know;" however, Agent Cayce was not qualified as an expert and no testimony was introduced at trial to prove that the Purchase Factor Method is an accepted scientific method to calculate specific amounts of unreported revenue. The State responds that the Defendant waived this issue because he failed to object at trial or raise it as a claim in his motion for new trial. The State further asserts that the Defendant has failed to establish plain error.

Tennessee Rule of Appellate Procedure Rule 3(e) states that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." The rule requires that issues presented in the motion for new trial be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court." Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (citing State v. Gauldin, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)). "[A]ppellate courts should review a motion for new trial in the light most likely to preserve the issue alleged, although courts cannot create an error where none has been legitimately preserved." Fahey v. Eldridge, 46 S.W.3d 138, 146 (Tenn. 2001). The Tennessee Supreme Court explained:

Before an issue can be properly preserved in a motion for new trial under Rule 3(e), a well-pleaded motion should (1) allege a sufficient factual basis for the error by setting forth the specific circumstances giving rise to the alleged error; and (2) allege a sufficient legal basis for th error by identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

Id.

The Defendant acknowledges that he failed to object to Agent Cayce's testimony at trial, but directs our attention to Ground 9 in the motion for new trial to rebut the State's claim that the issue was not properly preserved. In Ground 9, the Defendant asserts that "[t]he Court erred when it allowed speculative testimony about other amount[s] of money that Agent Cayce suspected were stolen when he testified to the 'Purchase Factor Method.'" He maintains that his reference to the "speculative" nature of Agent Cayce's testimony specified the issue to a "degree of reasonable of certainty" and put the State and trial court on notice of the error. We disagree. While the motion sets forth an adequate factual basis for the error by identifying the witness as Agent Cayce and referencing his testimony about the Purchase Factor Method, it fails to identify any legal ground supporting the conclusion that the admission of the testimony was improper, see Fahey, 46 S.W.3d at 142-43, i.e., that it was unreliable expert testimony presented through a lay witness. The general statement regarding the "speculative testimony" provided little guidance to the trial court as to the error alleged, and certainly failed to put the court on notice of claims regarding expert testimony. Indeed, the trial court, in the motion for new trial hearing, did not interpret it as an issue regarding expert testimony, and instead simply stated ". . . speculative testimony about how they arrived at the [P]urchase [F]actor [M]ethod. I don't believe there was any objection." Defense counsel did not attempt to clarify the issue or narrow it to one premised on the improper admission of expert testimony for the trial court's consideration. "[I]n order to preserve errors for appeal, the appellant must first bring the alleged errors to the attention of the trial court in a motion for new trial." Id. at 141 (citing Memphis St. Ry. Co. v. Johnson, 88 S.W.165 (1905)). This court "will not find an error, even under a liberal interpretation of the motion, where no error has actually been alleged[.]" Fahey, 46 S.W.3d at 146. Accordingly, this issue has been waived.

The Defendant further asserts that waiver notwithstanding, plain error review is necessary "to do substantial justice." The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. We additionally note that "rarely will plain error review extend to an evidentiary issue." State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (citation omitted).

Upon review of the record, we conclude that the Defendant has failed to establish all five factors required for plain error. See Adkisson, 899 S.W.2d at 641-42. Specifically, the Defendant failed to establish that the trial court breached any rule of law in admitting Agent Cayce's testimony regarding the Purchase Factor Method. The Defendant maintains that the inclusion of "pseudoscience" testimony about the Purchase Factor Method by a "non-qualified" individual violates the Defendant's right to a fair trial; however, we are unpersuaded that this testimony was scientific at all. Compare State v. Robertson, 130 S.W.3d 842 (Tenn. Crim. App. 2003) (concluding that a police officer's testimony regarding an out-of-court experiment with the victim's pressure cooker was not scientific evidence requiring expert testimony and that the fact that it was presented by a lay witness goes to weight rather than admissibility) with State v. Murphy, 953 S.W.3d 200, 202 (Tenn. Crim. App. 1997) (concluding that the HGN sobriety test is scientific evidence requiring expert testimony because the "testimony has no significance to the average juror without an additional explanation of the scientific correlation between alcohol consumption and nystagmus"). Here, Agent Cayce testified about the total monthly beer purchases made by Sam & Son and compared that number to the reported taxable sales. The jury "needed no further explanation of why such testimony is relevant or probative," see Murphy, 953 S.W.3d at 203, and could consider these numbers, along with the other evidence presented by the State, and apply common knowledge to determine whether the Defendant under reported taxable sales. Defense counsels thoroughly cross examined Agent Cayce, and elicited testimony that the numbers calculated were only estimations and that other factors, such as theft and spoilage, could account for the discrepancy in the numbers. The Defendant is not entitled to relief on this issue.

**II. Admission of 404(b) Evidence.** The Defendant next asserts that the trial court erred in admitting testimony concerning Sam & Son's failure to pay taxes in May, October, and November 2010 and its failure to pay taxes on other items sold at the store without a 404(b) hearing to determine the probative value of the testimony. The State responds that this issue has been waived because the Defendant failed to object to it at trial or include it in his motion for new trial. Further, the State asserts that the Defendant failed to establish plain error.

Under Tennessee Rule of Evidence 404(b), evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, this evidence may be admissible for "other purposes," so long as the following conditions are satisfied:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The term "other purposes" in the aforementioned rule has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

As stated in the rule, the defendant has the burden of requesting a jury out hearing. See State v. Jones, 15 S.W.3d 880, 895 (Tenn. Crim. App. 1999) (citing Tenn. R. Evid. 404(b)). A trial court "generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). Moreover, relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a); see also, State v. Lillard, No. M2008-00575-CCA-R3-CD, 2009 WL 2951270, at *7 ("[T]he failure to object, request a curative instruction[,] or move for a mistrial is typically grounds for waiver of an issue on appeal.") (citing State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995)). "When a party does not object to the admissibility of evidence . . . the evidence becomes

admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" Smith, 24 S.W.3d at 280 (quoting State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981)).

In the present case, the Defendant failed to contemporaneously object to any of the references of which he now complains on appeal, and failed to request a jury out hearing. Consequently, any objection to these references is technically waived. Waiver notwithstanding, we conclude that the Defendant is not entitled to relief. In the Defendant's motion for new trial, he only asserts error as to references made in the State's opening statement about "uncharged acts for the months of March, October[,] and November,"and fails to object to any other references made during trial. In its opening statement, the State explained that although Agent Cayce investigated Sam & Son for twelve months, the State only had conclusive evidence of which man was running the store for nine months; therefore, the State only charged the Defendant for the tax evasion for the months of December 2009, January 2010, and February 2010. Given the brief nature of the prosecutor's statement, taken in conjunction with the other evidence presented, we conclude that any error in the prosecutor's statement was harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). As to the other references throughout the trial, the Defendant failed to contemporaneously object and failed to raise them in the motion for new trial. Accordingly, he has waived any objection. Furthermore, the Defendant failed to establish plain error. See Adkisson, 899 S.W.2d at 641-42. The Defendant is not entitled to relief on this issue.

**III. Aggregation of Evidence.** The Defendant next asserts that the trial court erred in permitting the State to base the Defendant's theft charge on an aggregation of evidence. The Defendant argues that aggregation is inappropriate in a theft case based on tax evasion because tax evasion is more akin to theft of services. Additionally, the Defendant maintains that the State failed to establish that the Defendant's actions were part of a "single scheme to accomplish a particular goal." The State responds that aggregation was appropriate in this case, and that the Defendant's theft offenses were part of a continuing criminal scheme to allow aggregation of evidence.

Tennessee Code Annotated section 39-13-103 provides that "[a] person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Theft of property is a Class D felony if the value of the property obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000). T.C.A. § 39-14-105(3). The State may aggregate the value of stolen property taken in separate thefts "when separate acts

of theft are: (1) from the same owner; (2) from the same location; *and* (3) are pursuant to continuing criminal impulse or a single sustained larcenous scheme." State v. Cattone, 968 S.W.2d 277, 279 (Tenn. 1998) (citing State v Byrd, 968 S.W.3d 290, 291 (Tenn. 1998));[2] see also, State v. Nelson, 344 S.W.2d 540, 542 (Tenn. 1960) ("[W]here it appears that successive takings are actuated by a single, continuing, criminal impulse or intent or are pursuant to the execution of a general larcenous scheme, it has been held . . . that such successive takings constitute a single larceny, regardless of the extent of the time which may have elapsed between takings."). Whether a series of successive takings constitute "several thefts or one single crime must be determined by the particular facts and circumstances of each case." Nelson, 344 S.W.2d at 542.

Citing to State v. Cattone, 968 S.W.2d 277 (Tenn. 1998), the Defendant first asserts that aggregation is inappropriate in this case because a theft offense based on sales tax evasion is more akin to theft of services. As an initial matter, we note that the Defendant was charged and convicted under Tennessee Code Annotated section 39-14-103, which defines theft of property, as opposed to section 39-14-104, which defines theft of services. He does not challenge the sufficiency of the evidence supporting his conviction for theft of property, nor cite any law that suggests that we should treat his theft offense based on tax evasion as a theft of services offense for purposes of aggregation. Thus, we are unpersuaded by this argument. In any event, the Cattone Court clarified that aggregation is "inapplicable to theft of services" where the value of property was taken from *different owners*. 968 S.W.2d at 279. However, where the separate acts of theft are from the same owner and same location, and are part of a continuing criminal scheme, "aggregation is permitted under both the theft of property statute and the theft of services statute." Id. (citing T.C.A. §§ 39-14-103, -104). The Defendant does not contest that the theft offenses were from the same owner and same location; therefore, his contention that aggregation principles are inapplicable based on Cattone is without merit.

Next, the Defendant asserts that even if aggregation is applicable, the State failed to establish that his offenses were "part of a single scheme to accomplish any goal" such that aggregation was appropriate in this case. The Defendant maintains that the State produced

[2] In 2012, the legislature codified these aggregation principles in Tennessee Code Annotated section 39-14-105(b), which provides:

(1) In a prosecution for theft of property, theft of services . . . the state may charge multiple criminal acts committed against one (1) or more victims as a single count if the criminal acts arise from a common scheme, purpose, intent or enterprise.

(2) The monetary value of property from multiple criminal acts which are charged in a single count of theft of property shall be aggregated to establish value under this section.

-10-

no evidence suggesting that the Defendant and his co-defendant, Nassr, engaged in a continuing larcenous scheme, as evidence by the State's inability to discern which defendant controlled the store for several months. The State responds that it presented ample evidence to establish that the Defendant's conduct was not a series of isolated theft offenses, but rather was part of a continuous larcenous scheme carried out over the course of the investigatory period.

In State v. Nelson, 344 S.W.2d 530 (Tenn. 1960),[3] a case heavily relied upon by the State, the Tennessee Supreme Court analyzed whether the defendants' multiple acts of theft constituted "a single, continuing impulse or intent pursuant to the execution of a general larcenous scheme" such that aggregation was applicable. There, two officers of a local union embezzled funds from the union by writing checks themselves over a period of several years. The court noted that one of the defendants admitted that he had discovered a means of embezzling funds from the local union, and reasoned that this statement evidenced an "intent to launch forth upon a continuing course of conduct[.]" Id. at 542. Additionally, the defendants had written checks to themselves in small amounts, which the court found "clearly indicate[d] a purpose . . . that this was done to try to escape detection." Id. at 543. Finally, the court reasoned that the fact that these acts were done over a period of time showed that it was "a continuing scheme" and that the defendants were going to continue to do it until they were caught. Id. Based on this evidence, the court concluded that the defendants' conduct was part of a continuous scheme and that aggregation was appropriate. Id.

The analysis in Nelson provides guidance to our analysis in the present case and persuades us that the State sufficiently established that the Defendant's conduct was part of a single, continuous larcenous scheme. Here, Agent Cayce testified that both defendants

---

[3] The Defendant asserts that State v. Nelson, 344 S.W.2d 540 (Tenn. 1960) is inapposite to the case at hand because it involved the taking of personal property. Citing to State v. Desirey, 909 S.W.2d 20, 28 (Tenn. Crim. App. 1995), the Defendant maintains that the "Court has been generally reluctant to extend the single 'larcenous scheme' principle beyond a specific subset of theft cases." We interpret the Defendant's argument to be premised on his theory that theft offenses based on tax evasion are akin to theft of services, and therefore, not amendable to aggregation principles. Notwithstanding our conclusion that aggregation principles are applicable to the Defendant's case, we briefly note that Desirey addressed whether a defendant's separate convictions for bribery under Tennessee Code Annotated section 39-16-102 should have been consolidated because, the defendant argued, his conduct constituted "one continuous offense." 909 S.W.2d at 27-28. The court rejected the defendant's argument, stating, "[W]e do not believe that the general larcenous scheme principle, specially developed for certain larceny-related cases, readily transfers to these bribery offenses." Id. at 28. In the present case, however, the Defendant was convicted under Tennessee Code Annotated section 39-14-103, a chapter under which courts have long applied aggregation and the "general larcenous scheme" principle. See, e.g., Cattone, 968 S.W.2d 277 (Tenn. 1998); Byrd, 968 S.W.2d 290.

admitted to under reporting sales tax. He stated that the Defendant told him that "he knew that he was under reporting sales because business was slow, their expenses were high, and he needed it to operate the business and pay the bills." Similarly, Nassr told Agent Cayce that "he knew he was under reporting the sales because he needed to make a living and spend money on the family." See Nelson, 344 S.W.2d at 543 (noting that although the co-defendant's admission that he had discovered a means of embezzling funds was not admissible as evidence against the defendant, the court "could and should . . . consider this statement in order to determine clearly from this evidence that these defendants entered into a common and continuing scheme for the purpose of appropriating these funds").

Additionally, Sam & Son's tax preparer, Mr. Taylor, testified that although he told the Defendant to keep the store's z tapes for three years, he was never provided any z tapes and prepared all tax returns based upon the numbers provided to him by the Defendant and Nassr. The Defendant told Agent Cayce that the store did not keep z tapes, and instead he wrote the information from the z tapes on a piece of paper and discarded the tapes. From this evidence, the jury could infer that the Defendant intended to hide the store's true monthly sales in order to under report sales tax and enter into a common scheme with his co-defendant to accomplish this goal.

Finally, the State presented evidence that during the 12-month period, Sam & Son paid some sales tax each month, but continuously failed to pay all of the sales tax due. From these facts, the jury could conclude that the Defendant intended to escape detection, and that each month of under reported sales was part of a continuing scheme rather than an isolated theft. Cf. State v. Metcalf, C.C.A. No. 258, 1987 WL 11757, at *3 (Tenn. Crim. App. June 3, 1987) (reasoning that the defendant's theft offenses were not part of a continuous larcenous scheme where he wrote three checks for personal indebtedness but there "was no indication that, at the time [the defendant] wrote the initial check . . . he intended to write the second or even the third"). Based on this evidence, we conclude that the trial court properly permitted the State to aggregate the Defendant's theft charge. The Defendant is not entitled to relief on this issue.

**IV. References to the Defendant's Yemeni Background and Arabic Language.** The Defendant asserts that trial court erred in allowing multiple references to the Defendant's Yemeni background and Arabic language, and argues that these references prejudiced the Defendant's defense. The State responds that the Defendant waived this issue because the Defendant opened the door to the references and failed to contemporaneously object to the references. Further, the State asserts that the Defendant failed to establish plain error.

As correctly noted by the parties, "[r]acial considerations should play absolutely no part in any trial unless they are directly related to the issues fairly raised by th evidence in the

record." State v. William Charles Jones, No. 01C01-9512-CC-00402, 1997 WL 359224, at *5 (Tenn. Crim. App. June 30, 1997) (citing State v. Sparks, 563 S.W.2d 564, 569 (Tenn. Crim. App. 1978)). In his brief to this Court, the Defendant cites numerous references made throughout the trial to the Defendant's Yemeni heritage, his pursuit of the "American Dream," and the fact that he speaks Arabic. We note at the outset that, upon a thorough review of the record, all but one of the statements referenced by the Defendant in his brief were made or elicited by defense counsels. In fact, both defense counsels introduced the defendants' background and pursuit of the American dream as a theme in opening statements and resurfaced it throughout the trial.[4] The State, on the other hand, made only one reference to the Defendant's Arabic language during trial and one reference to the Defendant's "American Dream" in closing argument. Both of these references were made after the subject was first broached by defense counsels.[5]

During direct examination of Sam & Son's tax preparer, Mr. Taylor, the prosecutor asked Mr. Taylor about a tax return:

---

[4] In his opening statement, Nassr's attorney told the jury that the Defendant was Nassr's nephew, and that Nassr came to the United States from Yemen in 1980 "with nothing but a sixth grade education and the desire to work." The Defendant's counsel echoed the same theme in his opening statement, telling the jury that "[t]his little store . . . was part of [the Defendant]'s dream . . . his American dream to set out, start a business, contribute to society and raise his five children."

[5] During cross-examination of Agent Cayce, Nassr's defense counsel raised the issue of Nassr's accent. He asked Agent Cayce, "Mr. [Nassr] Arradi has got, . . . he has an accent, doesn't he," and questioned whether Agent Cayce could "effectively communicate" with Nassr. Likewise, the Defendant's counsel questioned Agent Cayce about his ability to communicate with the Defendant:

COUNSEL:            And so that day, you didn't have a translator?
AGENT CAYCE:    No, sir.
COUNSEL:            No one that spoke Arabic?
AGENT CAYCE:    No, sir.

Finally, during closing arguments, the Defendant's counsel told the jury:

I told you what this case was going to be about from the very beginning. A man with an American dream that set out to do the best he could with what he could the only way he knew how. And I can't help the fact that my client has a ninth grade education out of Yemen. He learned to speak English from one of their churches over there from a pastor that wasn't even really a teacher. But he sure does work hard, and he s[e]t out to raise his five children.

-13-

THE STATE:          I'd like for you to identify where the handwritten note on this return came from?  Who wrote that and where did those numbers come from?

MR. TAYLOR:         This return came from [the Defendant].  The F-S 3839 is his writing on the food stamps.  And the Arabic writing underneath came from him in the amount of $11,670.

THE STATE:          . . . [T]he number $11,670, what is the significance of that number on this return?

MR. TAYLOR:         The significance is the gross sales.

THE STATE:          So, you didn't write those numbers down there in that Arabic handwriting, did you?

MR. TAYLOR:         No, sir.  I had to ask [the Defendant] what it was and he told me gross sales.

Additionally, during rebuttal in closing arguments, the prosecutor responded to defense counsels' "American Dream" theme by telling the jury:

> Now, ladies and gentlemen, everybody's entitled to a dream, and the American dream means a lot to all of us.  But this is the first time in my life I've ever heard it suggested that the American dream includes the right to keep your business even if you have to lie and cheat and not pay your taxes that you collected from your customers . . . . I think the American dream is something sacred, something that we all value.  You work hard, play by the rules, you get treated equally by your fellow citizens.  You don't get some kind of mulligan because you aren't born in this country.

The Defendant did not contemporaneously object to either of these references, and thus, has waived the issue on appeal.   Tenn. R. App. P. 36(a).  In any event, we conclude that both statements were fairly raised by the evidence and were not overly prejudicial to the Defendant.  See Tenn. R. Evid 403. The Defendant is not entitled to relief on this issue.

**V.  Prosecutorial Misconduct.**  Lastly, the Defendant argues that the trial court erred by allowing the prosecutor to "denigrate defense counsel in closing argument."  The State responds that the Defendant failed to contemporaneously object to the statements, and thus has waived the issue on appeal.  Further, the State asserts that the Defendant failed to

-14-

establish that the prosecutor's statements were so improper as to affect the outcome at trial so as to warrant relief under plain error review.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

Here, the Defendant challenges the following statements made by the prosecutor during the State's rebuttal closing:

> Ladies and gentlemen of the jury, this is the first time I've ever heard a panel of jurors addressed as guys. We're not in a locker room, at a pep rally. We're in a court of law, and you jurors are entitled to respect and I will not address you as guys. You are ladies and gentlemen with a very important and solemn duty. I wonder if someone who addresses you as guys really respects your intelligence.

Later, the prosecutor stated,

. . . . And I just don't understand why [defense counsel] thinks that you need to hear about $139 500 times, because that's just part of the $7,494 that was stolen during this investigation.

Now they are good at attacking Agent Cayce, but I would remind you yesterday afternoon while he was on the stand, who had the attitude? We heard lots of innuendoes, insinuations, suggestions that [Agent Cayce] had done something underhanded and dirty and not fair. But there wasn't anything there. He answered every question sensibly.

Defense counsel did not object to either statement. Thus, we agree with the State that the issue has been waived. See Tenn. R. App. P. 36(a); State v. McPherson, 882 S.W.2d 365, 373 (Tenn. Crim. App. 1994); State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993); and State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991). Additionally, even if this Court were inclined to grant the requested relief, the Defendant has failed to demonstrate that he was prejudiced in any way by the prosecutor's remark. See State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994) (holding that when a prosecutor makes improper remarks during a closing argument, the appellate court must determine "whether the impropriety affected the verdict to the prejudice of the defendant"), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 611 (Tenn. 2004)(Barker, J., dissenting); see also State v. Seay, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996) (holding that the defendant must show that prosecutor's remark was "so inflammatory or so improper that it affected the verdict to his or her detriment"). Although some of the comments may have been improper, when viewed in the context of the entire argument and the weight of the evidence against the Defendant, we conclude that the brief comments did not affect the outcome of the proceedings. Likewise, the Defendant has failed to establish plain error. See State v. Armstrong, 256 S.W.3d 243, 250 (Tenn. Crim. App. 2008) (noting that the analysis for plain error review, specifically whether a substantial right of the accused has been affected, requires a finding that the error "affected the outcome of the trial proceedings . . . [which] is essentially the same requirement as that required to find prosecutorial misconduct") (citing State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003)). The Defendant is not entitled to relief.

**CONCLUSION**

Based on the foregoing authorities and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE